O.K. SAND & GRAVEL, INCOR-
PORATED, Plaintiff–Appel-
lant, Cross–Appellee,

v.

MARTIN MARIETTA TECHNOLOGIES,
INCORPORATED, Defendant–
Appellee, Cross–Appellant.

Nos. 93–1380, 93–1408 and 93–2003.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1994.

Decided Sept. 16, 1994.

G. Thomas Blankenship, Blankenship & Robbins, Indianapolis, IN, R. James George, John M. Harmon, G. Michael Lawrence, Robert M. Roller (argued), Michelle B. Bray, Graves, Dougherty, Hearon & Moody, Austin, TX, for plaintiff-appellant.

Donald E. Knebel (argued), Lynn C. Tyler, Barnes & Thornburg, Indianapolis, IN, for defendant-appellee.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Martin Marietta and O.K. Sand & Gravel own competing sand and gravel companies in Indianapolis.[1] O.K. Sand operates out of a plant on the south side of Indianapolis; Martin Marietta has plants on both the north and south sides. In 1984, Martin Marietta was running out of sand. At the same time, O.K. Sand needed financial and marketing assistance, so the two companies entered into an agreement whereby Martin Marietta would be O.K. Sand's exclusive sales agent. According to the agreement, effective in April 1984, Martin Marietta would sell O.K. Sand's aggregates at the prices on an O.K. Sand-approved Price List, and could discount these prices 10% for gravel and 20% for fill material. O.K. Sand would invoice Martin Marietta monthly for 85% of the O.K. Sand sales; the remaining 15% was Martin Marietta's commission.[2]

O.K. Sand claimed that Martin Marietta sold sand below the Price List and authorized discounts. According to O.K. Sand, Martin Marietta sold customers a package of O.K. Sand aggregate and Martin Marietta limestone; by deflating the price of the O.K. Sand aggregate, Martin Marietta could inflate the price of its limestone. O.K. Sand also claimed that Martin Marietta bought O.K. Sand's aggregate at a low price and re-sold it as its own at a higher price, and that Martin Marietta transferred O.K. Sand's aggregates to the Martin Marietta plant on the north side and sold from there.

Martin Marietta claims that in 1986, O.K. Sand gave it permission to establish the List Prices and to discount below the 20%. Moreover, Martin Marietta argued that O.K. Sand should have figured out that Martin Marietta was selling too low. The companies had a very crude information flow system whereby Martin Marietta sent O.K. Sand a monthly lump sum accompanied by a cryptic "Invoice Register." The Invoice Register did not specify the tonnage sold of any particular product, but only reported the gross tonnage each customer purchased and the total amount Martin Marietta had received. Martin Marietta claims that O.K. Sand could have calculated the average price for ton of each sale, and thus would have known that

---

1. O.K. Sand is an Indiana corporation with its principal place of business in Indiana. Martin Marietta is a Delaware corporation with its principal place of business in Maryland. We have jurisdiction pursuant to 28 U.S.C. § 1332.

2. The facts of the case are thoroughly discussed in the district court's published opinion, *O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 819 F.Supp. 771 (S.D.Ind.1992). We assume familiarity with these facts, and only summarize them here as necessary.

Martin Marietta sometimes sold below discount. O.K. Sand intermittently tried to make sense of the documents, but claims that getting more specific information from Martin Marietta was like pulling teeth (although O.K. Sand did not pursue the matter vigorously after its initial attempts).

O.K. canceled the sales contract in January 1989, complaining that Martin Marietta had sold products at unauthorized prices. Three months later, O.K. Sand entered into a new agency agreement with another sand and gravel company, American Aggregates. Under the agreement, American Aggregates allowed O.K. to mine its reserves and agreed to send O.K. Sand's products, rather than American Aggregates' sand, to its off-site customers. American Aggregates continued to supply its own sand to its on-site customers. Martin Marietta eventually arranged a contract as a dealer for Waverly Sand and Gravel, located outside of Indianapolis.

In April 1990, O.K. Sand filed a complaint against Martin Marietta alleging breach of contract, fraud, conversion and breach of fiduciary duty. The district court dismissed O.K. Sand's conversion claim for failure to state a claim. On Martin Marietta's motion for summary judgment, the district court found that a two-year statute of limitations applied to the breach of fiduciary duty claims (although a ten-year limitation applied to the breach of contract claims), but that a genuine issue of fact remained regarding fraudulent concealment, which would toll the running of the statute. The district court denied Martin Marietta's motion for summary judgment on the other claims.

Martin Marietta also filed a counterclaim alleging that O.K. Sand had failed to pay certain commissions, and that O.K. Sand's sales agreement with American Aggregates violated §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C. §§ 1, 2 & 14. O.K. Sand moved for summary judgment, claiming that Martin Marietta lacked standing to bring the Sherman Act claims, and had failed to allege an antitrust injury.

The district court granted summary judgment to O.K. Sand.

The case went to trial on both parties' breach of contract claims, and O.K. Sand's criminal conversion, breach of fiduciary duty, and constructive fraud claims. The district court granted a directed verdict on O.K. Sand's criminal conversion and punitive damages claims.

The jury filled out a special verdict form on each of O.K. Sand's claims. The form required the jury first to answer whether O.K. Sand had proven its claims. If the jury answered "yes," the form instructed it to consider whether Martin Marietta had proven its affirmative defenses of waiver, estoppel or laches. If the jury found that O.K. Sand had proven its claim and that Martin Marietta had not proven any affirmative defenses, the form instructed the jury to assess damages. On each claim, the jury found against O.K. Sand at the first step, finding that Martin Marietta did not breach its contract, breach a fiduciary duty, or commit constructive fraud; the jury thus did not answer any of the questions about Martin Marietta's affirmative defenses or damages. The jury also found against Martin Marietta on its breach of contract counterclaim. Costs were assessed against O.K. Sand.

## I.

### A. INSTRUCTIONS ON FIDUCIARY DUTY

 After receiving instructions on the basic elements of a constructive fraud and breach of fiduciary duty claim,[3] the jury was instructed on the scope of the duty for the breach of agency claim:

> Martin Marietta fulfilled any duty to disclose facts if it (1) provided to O.K. Sand information which O.K. Sand could have used to determine such facts ... or (2) provided information which would have reasonably led O.K. Sand to make an inquiry to obtain or learn such facts.

**3.** The jury was instructed that the elements of the breach of agency duty claim were the existence of a particular duty; breach; damages; and proximate causation. Instr. 22. The jury was instructed that the elements of the constructive fraud were a duty between the parties by virtue of the relationship of the parties; silence or representations that were deceptive and violative of that duty; justifiable reliance; and damages. Instr. 27.

Instr. 24. On the constructive fraud claim, the jury was instructed that O.K. Sand's reliance had to be reasonable and that:

O.K. Sand must have exercised common sense and used ordinary care, prudence and diligence in guarding against constructive fraud and discovering the truth.

Instr. 30.

O.K. Sand claims that these instructions erroneously placed upon O.K. Sand a duty of inquiry to discover Martin Marietta's wrongful conduct. While a duty to inquire may arise in an ordinary fraud case, O.K. Sand contends that there is no duty to inquire in a fiduciary relationship. Indiana courts have recognized that a fiduciary relationship giving rise to a duty to disclose information relieves a party of an affirmative duty to detect wrongdoing. *Dotlich v. Dotlich*, 475 N.E.2d 331 (Ind.App.1985); *Given v. Cappas*, 486 N.E.2d 583, 592 (Ind.App.1985); *see also, DeRance, Inc. v. PaineWebber, Inc.*, 872 F.2d 1312, 1321 (7th Cir.1989) (Wisconsin law).

But O.K. Sand never objected to these instructions. At the instructions conference, O.K. Sand tendered its own instruction on the duty of inquiry in a fiduciary relationship. Tr. 1/13/93, at VIII–44. O.K. Sand explained that the tendered instruction was intended to supplement, not modify, the existing instructions. *Id.* The district court ruled that the substance of O.K. Sand's tendered instruction was already covered by Instruction 24. *Id.* at 45–46. O.K. Sand did not object to the court's refusal to accept its instruction, nor to any other instruction on the matter. *Id.*

■ Federal Rule of Civil Procedure 51 provides: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." While filing an instruction may at times be seen as an objection to contrary instructions, *see Hebron v. Touhy*, 18 F.3d 421, 424 (7th Cir.1994); *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549 (7th Cir.1982), O.K. Sand specifically described its proposed instruction as a supplement to, rather than a substitute for, the instructions given. O.K. Sand also failed to object when the district court rejected its proffered instruction, and thus cannot now argue that the district court erred. Nor can O.K. Sand appeal to a plain error doctrine, since it does not apply to civil cases (except, of course, with respect to jurisdiction). *Maul v. Constan*, 928 F.2d 784, 787 (7th Cir.1991). "Submitting instructions is not sufficient to preserve an error in failing to give those instructions; the party who wants the instruction given must object to the refusal to give the instruction." *Salazar v. City of Chicago*, 940 F.2d 233, 242 (7th Cir. 1991).

O.K. Sand argues that the district court "cut off" its explanations or objections. Although the transcript indicates that the instruction conference was rather freeflowing, it does not support O.K. Sand's argument that it did not have an opportunity to object. The discussion of the issue at the conference ended:

COURT: . . . I think the substance of your tendered instruction is covered in the existing instructions . . . and I'll not put it in again. That's my ruling. Okay, Mr. Lawrence; anything else?

MR. LAWRENCE: That's all. Thank you. I would just make the—well—that's all.

Tr. at VIII–46.

Moreover, after the jury had been instructed, the district court asked the parties whether they had any further objections:

COURT: Do you have any other changes you wish to put, or any objections that you haven't previously had?

MR. LAWRENCE: Just for the record, I don't have any objection to the changes that have been suggested in conference. We renew objections regarding punitive damages and other claims dealt with in chambers.

Tr. at VIII–171.

Clearly, O.K. Sand had the last word, and the word was not "object." Having failed to make "a clear statement of the specific grounds for objection," *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 436 & n. 1 (7th Cir.1992), O.K. Sand has waived its claim of error.

### B. LACHES

■ O.K. Sand also claims that the district court misstated the law in its instruction on Martin Marietta's affirmative defense of laches. The jury was instructed that laches would be a defense if, in part, O.K. Sand "knew or should have known" of its claims against Martin Marietta during the period of delay. Instr. 31. O.K. Sand objects to the language "should have known," arguing that Indiana law imposes no such requirement. O.K. Sand properly objected to this instruction on these grounds during the instructions conference, but was overruled. Tr. at VIII 36–39.

But any error was harmless, because the verdict form indicates that the jury never reached the question of laches. As noted above, the verdict form tells us that the jury concluded that O.K. Sand had failed to prove its case, and that it did not reach the issue of affirmative defenses.

O.K. Sand argues that other jury instructions misled the jury to believe that it could consider the affirmative defenses as part of the first question of whether O.K. Sand had proven its claim. The first instruction on each claim stated that O.K. Sand could recover if it had established its claims *and* Martin Marietta had not proven any affirmative defenses. For example, on the breach of contract claim the jury was instructed of the elements of breach of contract and then instructed:

> If you find that these propositions have been established by a preponderance of the evidence and that the defendant had not proved any of its affirmative defenses by a preponderance of the evidence, then you should find in favor of the plaintiff on its breach of contract claim.
>
> If, on the other hand, you find that the plaintiff has not established all these elements by a preponderance of the evidence, or that the defendant has proved an affirmative defense by a preponderance of the evidence, then you should find in favor of the defendant on the plaintiff's breach of contract claim.

Instr. 17. A similar instruction was given on constructive fraud and breach of fiduciary duty. Instr. 22, 27. O.K. Sand argues that

following these instructions, a jury might believe that it could read back affirmative defenses into the principal claim. But the instructions, when taken as a whole, were clear. Instructions 17, 22 and 27 were correct statements of the law in this respect— O.K. Sand would win if it proved its case and Martin Marietta disproved its defenses. *Cf. Wilk v. American Medical Ass'n,* 719 F.2d 207, 218 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984) ("we must look to the instructions as a whole, in a common sense manner . . . inquiring whether the correct message was conveyed to the jury reasonably well").

The verdict form plainly spelled out the method of reasoning the jury was to follow: it was to consider first the elements of the claim, and then consider affirmative defenses. At bottom, O.K. Sand argues that the jury did not follow the instructions on the jury form, and that it considered affirmative defenses but did not fill out the appropriate box so indicating. But we presume that jurors understand and follow their instructions, *Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1627–28, 20 L.Ed.2d 476 (1968); O.K. Sand gives us no reason to believe that the verdict form is an inaccurate statement of the jury's decisions.

### C. STATUTE OF LIMITATIONS

■ O.K. Sand contends that the district court erroneously instructed the jury about the statute of limitations on the constructive fraud and breach of fiduciary duty claims. The jury was instructed that a two-year statute of limitations applied; O.K. Sand argues that the statute of limitations was six years.

Martin Marietta argues that while O.K. Sand objected to a two-year statute of limitations on constructive fraud, it did not object to a two-year limitations on breach of fiduciary duty, and thus has not preserved the latter error for appeal. O.K. Sand claims that it did object by arguing that constructive fraud and breach of fiduciary duty were the same. At the instructions conference, O.K. Sand's counsel began, "the statute of limitations for fraud is six years, and [I] think it would be inappropriate to have it

included in the 1988 cutoff." Tr. at VIII–8. In response to the court's observation that constructive fraud was essentially the same as breach of fiduciary duty, which was subject to a two-year limitation, O.K. Sand claimed that "there is a difference between breach of fiduciary duty and constructive fraud," and that breach of fiduciary duty is akin to a lesser included offense of constructive fraud. *Id.* The remainder of the argument was incoherent at best, and cannot even generously be construed as an objection to the application of a two-year limitations period.[4] *Id.* at VIII–9. O.K. Sand had no response when the district court ruled that a two-year limitation applied to both claims. At best, O.K. Sand has only preserved its argument that the two-year limitation was erroneous with respect to constructive fraud.

The jury instruction read in relevant part: Martin Marietta's fourth affirmative defense is the statute of limitations defense. Martin Marietta claims that O.K. Sand's breach of agency duty and constructive fraud claims are partially barred or limited by what is known in the law as the statute of limitations. A statute of limitations is the time allowed by a statute for a plaintiff to bring a lawsuit. **You are instructed that the statute of limitations in a breach of agency claim and a constructive fraud claim is two years.** You are further instructed that O.K. Sand filed this action on April 24, 1990. **Accordingly, if you find that the statute of limitations applies to O.K. Sand's claims for breach of agency duty and constructive fraud, then damages for those claims can only be based on activities that occurred on or after April 24, 1988 and O.K. Sand cannot recover damages based on the activities of Martin Marietta occurring before that date.**[5]

Instr. 35. (emphasis supplied).

Martin Marietta argues that the jury never reached the affirmative defense of the statute of limitations. O.K. Sand argues, as it did on the laches defense, that the jury may not have considered the statute of limitations as an affirmative defense, but could have woven it into the decision on liability. Moreover, argues O.K. Sand, the instruction had a particularly prejudicial effect on the finding that O.K. Sand had not proven its claims, because the instruction precluded the jury from considering as evidence of liability any conduct occurring before April 1988, by which time most of the alleged wrongful acts had occurred.

But the court's instruction clearly was a limitation on *damages;* it did not preclude the jury from considering evidence about Martin Marietta's pre–1988 conduct in determining liability. O.K. Sand's claim that Martin Marietta had breached its duties from 1984 until 1989 was essentially an allegation of a continuing violation, a theory whereby activity occurring outside the limitations pe-

---

4. The argument that O.K. Sand claims embodied its objection to application of a two-year statute of limitations to breach of duty went as follows:

> In other words, my argument, if you will, your Honor, is that breach of fiduciary duty is a lesser, if you will, lesser included offense, and that breach of duty included actions that would not constitute constructive fraud, and constructive fraud must show the additional action taken for the benefit of the principal. And so that would be the difference, and therefore would—That's the reason we would argue that there be two separate counts. It goes—The reason that it has a meaning to us, and the consequences of it is that we would also be asking the court to reconsider its instruction on commissions. The court has—I think correctly—has included commissions, our entitlement to ask the jury to find commissions, return of commissions for that breach of fiduciary duty.

> Case law also—I will be happy the give the court case law and Storey on Equity and three other treatises that establish that fraud as well, and breach of duty is again a lesser included, that even more serious constructive fraud gives rise to a cause of action for the damages, if you will, to return commissions as well, so we would be seeking return of the commissions on the fraud count as well.
>
> You say the damages, we would be seeking the same damage in both places under two separate theories. We understand that we can't recover the damages twice; we must elect a remedy after the jury comes back, That's the basis for both causes of action.
>
> Tr. at VIII–9.

5. The remainder of the instruction concerned O.K. Sand's equitable argument that the statute of limitations did not apply because Martin Marietta had fraudulently concealed the facts giving rise to a cause of action.

riod can be considered for liability purposes if it is part of an on-going violation. *See, e.g., Chambers v. TransAir,* 17 F.3d 998, 1002 (7th Cir.1994). The instruction the court gave was appropriate in such circumstances: it did not in any way limit the jury's consideration of evidence, but only stated that "damages ... can only be based on activities that occurred on or after April 24, 1988 and O.K. Sand cannot recover damages based on the activities of Martin Marietta occurring before that date." Since the jury found no liability and never reached the question of damages, whether the district court accurately informed them of a limitation on damages is irrelevant.[6]

### D. CONVERSION

■ O.K. Sand based its conversion claim on Martin Marietta's alleged transfers of O.K. Sand's products to its north side facility and reductions in the price of O.K. Sand's products to boost sales of its own products. The district court dismissed the civil conversion claim on the grounds that O.K. Sand had failed to make a demand for return of the sand. Under Indiana law, "where the initial possession is lawful, [civil] conversion occurs only after an unqualified demand for return." *Coffel v. Perry,* 452 N.E.2d 1066, 1069 (Ind. App.1983). A demand will be excused if the defendant came into possession of the property unlawfully, *French v. Hickman Moving & Storage,* 400 N.E.2d 1384, 1388 (Ind.App. 1980), or if it would be futile. *Merchants Natl. Bank & Trust Co. v. H.L.C. Enterprises, Inc.,* 441 N.E.2d 509, 514 (Ind.App.1982). The district court concluded that O.K. Sand had not alleged that Martin Marietta possessed the sand unlawfully, and thus was not excused from the demand requirement. Indeed, O.K. Sand's entire complaint was based on the theory that Martin Marietta, as O.K. Sand's sales agent, had lawful control of O.K. Sand's products. On appeal, O.K. Sand argues only that demand should have been excused because Martin Marietta allegedly engaged in self-dealing; however, O.K. Sand provides no evidence that Indiana courts

would agree to carve out this exception to the demand requirement, so we refuse to do so here.

■ After the close of evidence at trial, the district court entered a directed verdict in favor of Martin Marietta on O.K. Sand's criminal conversion claim. Criminal conversion occurs when a person exercises unlawful or unauthorized control of goods, and does not include a demand requirement. Ind. Code § 35–43–4–3 (1988). The district court concluded that O.K. Sand had failed to put forth any evidence of "unlawful control." On appeal, O.K. Sand admits that at all times Martin Marietta had lawful control of the products, but argues that Martin Marietta should be liable anyway since it breached its fiduciary duties. Again, O.K. Sand offers no support for this reading of the statute, and we will affirm the district court's directed verdict on the criminal conversion claim.

### E. COSTS

■ The district court awarded Martin Marietta $37,874.38 in costs as the prevailing party. F.R.C.P. 54(d). O.K. Sand argues that since Martin Marietta did not prevail at trial on its breach of contract claim, or at summary judgment on its antitrust claim, it cannot be considered the "prevailing party." The award of costs is firmly committed to the district court's discretion, *Landau & Cleary Ltd. v. Hribar Trucking, Inc.,* 807 F.2d 91, 94 (7th Cir.1986), and the court may award costs to whichever party prevails in "the substantial part of the litigation." *Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble,* 924 F.2d 633, 641 (7th Cir.1991). Throughout the litigation the parties kept revising their damages estimates, so it is no surprise that each argues on appeal that it sought (and lost) only a paltry sum, while its opponent lost a small fortune. The district court concluded that O.K. Sand had asserted numerous claims worth about $2.2 million, and thus "far outweigh[ed] the number and value of the claims asserted by the defendant." Although it is true that Martin Mar-

---

**6.** O.K. Sand also claimed that the district court erred when it entered a directed verdict against O.K. Sand on its claim for punitive damages. O.K. Sand admits that the issue would only be relevant if we reversed the jury's findings of liability. Since we affirm the district court with respect to liability, we do not need to consider this question of damages.

ietta lost on its $50,000 breach of contract counterclaim, it successfully avoided a potentially multi-million dollar judgment on several claims. We cannot conclude that the district court abused its discretion when it determined that Martin Marietta had "substantially" prevailed in the litigation. The award of costs is affirmed.

## II.

Martin Marietta cross-appeals the summary judgment in favor of O.K. Sand on Martin Marietta's antitrust counterclaims. Count One of the counterclaim alleged that O.K. Sand had terminated its agreement with Martin Marietta and entered into an agreement with American Aggregates in order to increase the price of sand and gravel, "adversely affecting the ability of Martin Marietta to compete in that market," in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Count One also alleged that O.K. Sand's agreement with American Aggregates precluded American Aggregates from competing with O.K. Sand, and thus "foreclose[d] competition in a substantial portion of commerce, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14." Count Two alleged that the O.K. Sand–American Aggregates agreement violated § 2 of the Sherman Act, since O.K. Sand intended to monopolize the southern Indianapolis sand and gravel market. Martin Marietta sought damages under § 4 of the Clayton Act for commissions it would have earned on sales of O.K. Sand's products had it not been terminated as an agent.

Martin Marietta had put forth three theories of damages: that it suffered lost profits as an agent terminated pursuant to O.K. Sand's price-fixing conspiracy with American Aggregates; that as a competitor it was injured by higher prices and a foreclosure of competition; and that it was an injured former consumer-for-resale. The district court held that Martin Marietta had introduced no evidence to support its first theory that it

was terminated because of O.K. Sand's agreement with American Aggregates, and thus lacked standing to bring this claim. The district court also held that under neither of the remaining two theories had Martin Marietta alleged an antitrust injury.

It is not entirely clear whether Martin Marietta is pursuing on appeal all of the theories of recovery it alleged before the district court. At oral argument, Martin Marietta claimed, in nearly the same breath, that this case involves a boycott, a refusal to deal, a terminated distributorship and an injured competitor. Martin Marietta later seemed to abandon the boycott and injured seller theories, advocating instead a theory that its termination as a dealer evolved into a "refusal to deal on terms that allowed us to be an effective market player." Perhaps the only way to make sense of Martin Marietta's apparent confusion is to consider each theory in turn. We, of course, review the grant of summary judgment *de novo*.

Martin Marietta's complaint alleged that it was injured as a competitor when O.K. Sand and American Aggregates increased sand and gravel prices in the market. But to the extent that Martin Marietta was also a seller in the market, increased prices caused it no injury, let alone antitrust injury.[7] In order to maintain an antitrust action under § 4 of the Clayton Act, Martin Marietta must show more than an injury linked to a violation of the antitrust laws. It must prove "an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977); *see Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 540, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983); *Local Beauty Supply*, 787 F.2d at 1201. Clearly, price increases

---

7. The district court held that Martin Marietta lacked standing to bring this claim, although we affirm on the ground that Martin Marietta has failed to allege an antitrust injury. For discussion of the relationship between antitrust standing and antitrust injury, *see Greater Rockford Energy and Technology v. Shell Oil, 998 F.2d 391,* 394–96 & n. 7 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Local Beauty Supply, Inc. v. Lamaur, Inc.,* 787 F.2d 1197, 1201 (7th Cir.1986); P. Areeda and H. Hovenkamp, *Antitrust Law* (1993 Supp.) ¶ 334.3.

could not be considered an antitrust injury to competitors. A competitor may not "recover damages for any conspiracy … to charge higher than competitive prices…. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioner's competitors, respondents stand to gain from any conspiracy to raise the market price." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 582, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986) (citations omitted); *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). This holds true for cases brought under both §§ 1 and 2 of the Act. *Atlantic Richfield,* 495 U.S. at 339–41, 110 S.Ct. at 1891–92. Thus Martin Marietta's argument that the O.K. Sand–American Aggregates agreement resulted in a 75% market share that would allow them to engage in predatory pricing (in violation of § 2) still requires Martin Marietta to prove that it suffered an antitrust injury as a result of O.K. Sand's alleged § 2 violation. *See also Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1418 (7th Cir.1989). Since Martin Marietta has failed to show that it has suffered the type of injury the antitrust laws seek to prevent, it has not shown an antitrust injury on this theory.

 If, on the other hand, Martin Marietta were arguing that it was injured as a consumer, higher prices or restrictions in output due to an unlawful combination would be the "type" of injury the antitrust laws intend to prevent. *Nelson v. Monroe Regional Medical Ctr.,* 925 F.2d 1555, 1564 (7th Cir.), *cert. dismissed,* —— U.S. ——, 112 S.Ct. 285, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991). Thus Martin Marietta characterizes O.K. Sand's termination of a dealership as a refusal to deal, attempting to bring its case within the purview of *Nelson.* In *Nelson,* we held that consumers denied health care as a result of a hospital merger had alleged an antitrust injury. *Id.* at 1564–65. Martin Marietta likens its termination as a dealer to the *Nelson* consumers' "termination" as patients, arguing that this case involves "O.K. Sand's termination of its Sales Agency Agreement with Martin Marietta and subsequent refusal to deal with Martin Marietta as an agent." Reply Br. 4/5/94 at 2. Martin

Marietta also argues at one point that O.K. Sand would not sell to Martin Marietta at *all*—or, in effect, that O.K. Sand was engaging in a boycott. But the boycott argument is frivolous, since Martin Marietta admits that it never attempted to purchase O.K. Sand's products at the retail price. Likewise, Martin Marietta presented no evidence that, as a consumer, it paid a monopoly or above-the-market price for O.K. Sand or American Aggregates's products, and thus has not shown that it suffered any injury at all. As Martin Marietta's own description of its case ("a refusal to deal as an agent") makes clear, the *Nelson* analogy is inapt, as Martin Marietta's only legitimate claim is that it is a terminated dealer.

Martin Marietta's claims that it was terminated as a dealer because O.K. Sand and American Aggregates entered into an illegal agreement to price-fix and monopolize the market. Even if Martin Marietta could prove that its injury is the *type* of injury the antitrust laws were intended to prevent, *see Local Beauty Supply,* 787 F.2d at 1201 (terminated dealer suffers no antitrust injury when terminated for undercutting maximum price maintenance scheme), Martin Marietta's claim would fail. To establish an antitrust injury, a plaintiff must show not only that the injury is of the type intended to be protected by the antitrust laws, but that the violation was "the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred." *See Greater Rockford Energy & Technology v. Shell Oil,* 998 F.2d 391, 394–96 (7th Cir.1993) (citations omitted). Martin Marietta failed to adduce evidence that the alleged antitrust violations (either to price-fix or gain a monopoly) were the but-for cause of Martin Marietta's termination. *Greater Rockford,* 998 F.2d at 395. The causation element of an antitrust injury stems, of course, from the requirement that a plaintiff show that its injury "flows from that which makes the defendants' acts unlawful." *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 698. "[T]he plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." *Greater Rockford,* 998 F.2d at 401. Martin Marietta points to

evidence that O.K. Sand was satisfied with Martin Marietta's performance as a sales agent as sufficient proof of causation. Since O.K. Sand had no other reason to terminate their agreement, argues Martin Marietta, O.K. Sand must have terminated it in order to enter into an illegal combination with American Aggregates.

This, however, certainly does not show that the termination *caused* the illegal combination. At best, the termination merely removed an obstacle to the formation of the combination. Martin Marietta makes the illogical argument that, since its termination was a necessary prerequisite to O.K. Sand's entering into an agreement with American Aggregates, the agreement caused the termination. But the termination, as we have noted, was merely a step in a sequence. In any event, other factors can easily explain why O.K. Sand terminated Martin Marietta four months before entering into a new agreement with American Aggregates. *See Greater Rockford*, 998 F.2d at 402, and cases cited therein. Martin Marietta has "failed to show with a fair degree of certainty that the antitrust violation was a material and substantial factor causing their alleged injuries. Hence, the plaintiffs did not suffer an antitrust injury." *Id.; cf. Indiana Grocery*, 864 F.2d at 1412 ("an antitrust plaintiff opposing a motion for summary judgment must present evidence that tends to exclude the possibility that the defendant's conduct was as consistent with competition as with illegal conduct").

## III.

The decisions of the district court are AF-FIRMED.